**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 1:25-cv-21667-RUIZ-Louis**

GILLIAN CRAMER, *et. al.*,

     *Plaintiffs*,

v.

MD EXAM LLC,

     *Defendant*.

_____/


**DEFENDANT MD EXAM'S MOTION FOR JUDGMENT ON**
**THE PLEADINGS PURSUANT TO FED. R. CIV. P. 12(C) AND**
**FOR ENTRY OF JUDGMENT PURSUANT TO FED. R. CIV. P. 58**


Dated: July 17, 2025                   By: _____

                                          Aaron S. Weiss (FBN 48813)
                                          aweiss@carltonfields.com
                                          Carlton Fields, P.A.
                                          700 N.W. 1st Avenue, Ste. 1200
                                          Miami, Florida 33136
                                          Telephone: 305-530-0050

                                          *Attorneys for Defendant MD Exam, LLC*

# TABLE OF CONTENTS

SUMMARY ..................................................................................................1

INTRODUCTION...........................................................................................1

LEGAL STANDARD........................................................................................3

ARGUMENT.................................................................................................3

**I.     The Court Should Grant Judgment on The
       Pleadings in MD Exam's Favor Because the Regulation
       Plaintiffs Invoke Does Not Apply to Cellular Phones.............................4**

      **A.     This Court's *Turizo* Analysis Was
            Correct and Resolves this Case..............................................10**

            **i.     Plain Meaning.............................................................11**

            **ii.     Interpretive Clues from Within the Statute............................11**

            **iii.     Regulatory History......................................................16**

            **v.     *Loper Bright* .............................................................17**

            **v.     Legislative History .......................................................17**

            **vi.     Grammatical Clues ......................................................18**

**II.     The Court Should Enter Judgment in MD
       Exam's Favor Because There Is No Private Right
       of Action to Enforce the Regulation Plaintiffs Invoke............................19**

      **A.     TCPA Section 227(c) Provided 120 Days to
            Enact Rules Subject to a Private Right of Action...........................21**

      **B.     The FCC Promulgated Two Rules Within Section
            227(c)'s Statutory Deadline, but Neither Is at Issue Here.................23**

      **C.     The Rule Plaintiffs Are Suing Under Was
            Enacted Eleven Years After § 227(c)'s Statutory
            Deadline And Thus Cannot Be Enforced Privately ........................23**

**CONCLUSION ........................................................................................25**

Defendant MD Exam LLC ("MD Exam") moves, pursuant to Fed. R. Civ. P. 12(c) and 58, for entry of an order granting it judgment on the pleadings and entering judgment in its favor and against Plaintiffs Gillian Cramer and Jamie Crowder ("Plaintiffs") with respect to Plaintiffs' Complaint [ECF No. 1] alleging violations of the Telephone Consumer Protection Act ("TCPA").

## SUMMARY

Colloquially speaking, this is a TCPA case—one of more than 360 such cases that have been filed in this District since the beginning of 2024, according to a CM/ECF query. And while TCPA cases have become routine and produced a large body of case law from courts within this District and the Eleventh Circuit, the world of TCPA jurisprudence has just been blown up. This is because less than a month ago the Supreme Court issued its decision in *McLaughlin Chiropractic Assocs., Inc. v. McKesson Corp.*, 145 S. Ct. 2006, 2022-23 (June 20, 2025) where it held that the Hobbs Act does not bind district courts to follow the FCC's interpretations of the TCPA.

Following *McLaughlin*, MD Exam offers two separate grounds that support the entry of judgment on the pleadings in their favor with respect to Plaintiffs' one-count TCPA claim:

1. As this Court stated in *Turizo v. Subway Franchisee Advert. Fund Tr. Ltd*., 603 F. Supp. 3d 1334, 1340-41 (S.D. Fla. 2022), calls to cellular phones are not covered by the relevant section of the TCPA (47 U.S.C. § 227(c)(5)).

2. The private right of action under 47 U.S.C. § 227(c)(5) that Congress authorized in 1991 was tied to regulations that Congress stated had to be promulgated by the FCC no later than September 20, 1992. The regulations that Plaintiffs are suing on, however, were not promulgated until 2003.

## INTRODUCTION

As has been widely reported over the last few weeks in the legal press and in commentary from both the consumer and industry side,[1] the Supreme Court through its decision in *McLaughlin*

---

[1] A few examples include: Alison Grande, *TCPA Litigants Brace For "Seismic Shift" After Deference Blow*, Law360 (June 25, 2025) (legal press), https://tinyurl.com/y5yau3sd; Patrick Crotty, *Supreme Court TCPA Ruling Restricts FCC's Power*, National Consumer Law Center

has, in essence, unleashed a bomb that blew up the body of case law that TCPA litigants and judges adjudicating TCPA cases have relied on for decades. This will impact the precedential value of many of the Eleventh Circuit TCPA decisions, and will also undermine the value of hundreds of TCPA decisions from Florida federal district courts (and other district courts) that have routinely been recognized as persuasive precedent.

On many issues that routinely come up in TCPA cases, it may take some time for the courts to sort through the wreckage.[2] However, the task here should not be complicated, as this Court addressed the issue that is at the center of this case three years ago in *Turizo*, where it stated that the FCC's prohibitions on contacting cellular phone subscribers registered on the National Do-Not-Call Registry (the "DNC Registry") are *ultra vires*, because the FCC expanded the scope of its rules to include cellular phones "without any congressional grant of authority to do so." 603 F. Supp. 3d at 1341. At the time, binding Eleventh Circuit case law construing the Hobbs Act required district courts to follow the FCC's rule. *Id.* at 1341-42 (citing *Murphy v. DCI Biologicals Orlando, LLC*, 797 F.3d 1302, 1307 (11th Cir. 2015), which quoted *Mais v. Gulf Coast Collection Bureau, Inc.,* 768 F.3d 1110, 1120-21 (11th Cir. 2014)). In *McLaughlin*, the Supreme Court overturned the legal basis for the holdings in those cases and held that this Court is no longer bound by the Hobbs Act.

---

Digital Library, (June 24, 2025) (consumer-interest), https://tinyurl.com/3vjfb248; Eric J. Troutman, *Breaking: They Did It!!: SCOTUS Guts the Hobbs Act! District Courts Free to Disregard FCC TCPA Rulings in Civil Enforcement Actions*, National Law Review (June 20, 2025) (industry-interest), https://tinyurl.com/4zvffxr5.

[2] For example, in *Moise v. Credit Control Servs., Inc.*, Judge Seitz found that she was bound, under the Hobbs Act, to follow a formulation of "prior express consent" under the TCPA as promulgated by the FCC in its 2008 Order. 950 F. Supp. 2d 1251, 1253-54 (S.D. Fla. 2011). Similarly, in *Bobo's Drugs, Inc. v. Fagron, Inc.*, the court found that declining to follow FCC regulations from 2006 FCC order regarding who was a sender of a fax under the TCPA "would likely violate the Hobbs Act." 314 F. Supp. 3d 1240, 1246 (M.D. Fla. 2018). These and many other TCPA related issues will require a fresh look.

Plaintiffs' Complaint presents a clean shot for this Court to affirmatively rule on the issue on which it was handcuffed in *Turizo*. Plaintiffs claim that they received multiple unwanted text messages from MD Exam to their cellular phones, and that these text messages violated the TCPA because their cellular phones were on the DNC Registry. Specifically, they allege that MD Exam violated regulations promulgated by the FCC that are codified at 47 C.F.R. § 64.1200(c)(2) and which Plaintiffs contend is actionable pursuant to 47 U.S.C. § 227(c)(5).

Judgment should be entered in MD Exam's favor for the reason this Court discussed in *Turizo*: Congress did not give the FCC authority to expand its regulations relating to the DNC registry to cellular subscribers. Judgment should also be entered in MD Exam's favor because there is no private right of action for plaintiffs to privately enforce 47 C.F.R. § 64.1200(c)(2). The time-limited authority Congress gave to the FCC to enact regulations subject to a private right of action under § 227(c) expired 11 years before the FCC promulgated 47 C.F.R. § 64.1200(c)(2).

## LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), the complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And, as this Court has noted, "[w]hen a defendant moves for judgment on the pleadings pursuant to Rule 12(c), the motion "is governed by the same standard as a motion to dismiss for failure to state a claim on which relief may be granted" under Rule 12(b)(6). *Roman v. Spirit Airlines, Inc.*, 482 F. Supp. 3d 1304, 1311 (S.D. Fla. 2020), *aff'd*, 2021 WL 4317318 (11th Cir. Sept. 23, 2021)

## ARGUMENT

MD Exam advances two arguments in favor of the entry of judgment on the pleadings, which can be distilled as follows: (1) 47 U.S.C. § 227(c)(5) does not apply to calls (including texts) to cellphones; and, (2) Congress has never authorized a private right of action for calls (including texts) made to any telephone number on the DNC Registry.

I.      **The Court Should Grant Judgment on The Pleadings in MD Exam's Favor Because the Regulation Plaintiffs Invoke Does Not Apply to Cellular Phones**

As this Court noted in *Turizo*, the FCC expanded the scope of its rules to include cellular phones "without any congressional grant of authority to do so." 603 F. Supp. 3d at 1341. And now, "[t]he Hobbs Act does not preclude district courts in enforcement proceedings from independently assessing whether an agency's interpretation of the relevant statute is correct." *McLaughlin*, 145 S. Ct. at 2013. The Supreme Court has now instructed that district courts presented with legal interpretations by the FCC, and other agencies subject to the Hobbs Act, "should interpret the TCPA under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation." *Id.*

The Eleventh Circuit's decision issued a few months ago in *Ins. Mktg. Coal. Ltd. v FCC.*, 127 F.4th 303, 317-18 (11th Cir. 2025), which vacated another TCPA rule promulgated by the FCC, is also instructive.[3] In that case, the Eleventh Circuit made clear that "[a]gencies have only those powers given to them by Congress, and 'enabling legislation' is generally not an open book to which the agency [may] add pages and change the plot line." *Ins. Mktg. Coal. Ltd.*, 127 F.4th at 317 (quoting *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) (cleaned-up)). The Eleventh Circuit further noted that "a generic grant of rulemaking authority to fill gaps does not allow the FCC to alter the specific choices Congress made." *Id.* at 314 (cleaned-up).

Also, when the Court endeavors to determine the meaning of a term in a statute, it "normally interprets a statute in accord with the ordinary public meaning of its terms at the time of its enactment." *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1278 (11th Cir. 2021) (quoting *Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 654 (2020)); *Clements*

---

[3] *Ins. Mktg. Coal.* came to the Eleventh Circuit for direct review (*i.e.*, a pre-enforcement challenge) to an FCC rule under the Hobbs Act. *Ins. Mktg. Coal. Ltd.*, 127 F.4th at 311 n. 9.

*v. Florida*, 59 F.4th 1204, 1222 (11th Cir. 2023) (Newson, J., concurring) (quoting *Bostock* and describing the principle as "hornbook law").

In this regard, it is important to keep in mind how different the world was when the TCPA was enacted. When the TCPA was enacted in 1991, there were only approximately 7.6 million cellular telephones subscribers. https://www.gao.gov/assets/a122795.html. Twelve years later, when the FCC issued its order that treated cellular phones as residential phones, the number had jumped more than twenty-fold to 158.7 million cellular telephones subscribers. *Id.* And in its most recent year-end report, the FCC indicates that, as of the end of 2023, there were approximately 386.6 million mobile wireless connections at year-end 2023—a more than fifty-fold increase. *In Re Commc'ns Marketplace Report*, 2024 WL 5330303, at *200 n.163 (F.C.C. Dec. 31, 2024) (the "2024 FCC Report").

## A.      This Court's *Turizo* Analysis Was Correct and Resolves this Case

In *Turizo*, this Court engaged in the interpretive inquiry *McLaughlin* now requires. As further detailed in Section II(A) below (covering the history of the TCPA), and as this Court observed in *Turizo*, the "TCPA explicitly authorized the FCC to establish a 'single national database' of telephone numbers belonging to '*residential*[4] subscribers' who object to receiving telephone solicitations." *Id.* at 1339 (quoting 47 U.S.C. § 227(c)(3)). With that authorization, the FCC enacted a rule prohibiting anyone from "initiating any telephone solicitation to 'a *residential* telephone subscriber who has registered his or her telephone number on the national do-not-call registry[.]'" *Id.* at 1339-40 (quoting 47 C.F.R. § 64.1200(c)(2) (cleaned-up)).

Though these statutory and regulatory provisions "by their own terms [] apply to 'residential telephone subscribers,'" the Court noted that the FCC issued a rule that functioned to

---

[4] Unless otherwise indicated, all emphasis is added and internal citations and quotations are omitted.

"extend[] the rule in section 64.1200(c)(2) to cover 'wireless telephone numbers'" in an order the FCC issued in 2003. *Id.* at 1340 (citing *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 18 F.C.C. Rcd. 14014, 14039 (2003) ("2003 DNC Order") (the FCC "will presume wireless subscribers who ask to be put on the [DNC Registry] to be 'residential subscribers'")). The "purported upshot" of the FCC's maneuvering was that "the DNC Registry protections apply to residential and cellphone numbers alike." *Id.*

This Court's plain text evaluation of § 227(c) and § 64.1200(c)(2), which emphasized the use of the term "residential" and not "cellular" in each provision, and other traditional tools of statutory interpretation, demonstrates that the extension of the DNC Registry's protections to cellular phone users was "an unauthorized expansion of the private right of action for violations of the TCPA's do-not-call provision[.]" *Id.* at 1342. This Court observed that "the text of the TCPA distinguishes between 'residential' and 'cellular' telephone lines." *Id.* at 1340 (comparing 47 U.S.C. § 227(b)(1)(A)(iii), which concerns prerecorded calls to "cellular" telephone numbers, with 47 U.S.C. § 227(b)(1)(B), which concerns prerecorded calls to "residential" numbers).

This Court also noted that the 2003 DNC Order "recognizes that section 227(c) granted the FCC authority with respect to 'residential' numbers only." *Id.* at 1341 (citing 18 F.C.C.R. at 14039 (recognizing that Congress explicitly "expressed concern with residential privacy" when discussing the do-not-call list)). An immediately preceding provision, § 227(b)(2)(H), allows the FCC to limit the number and duration of debt collection calls made to a number assigned to a "cellular telephone service," but omits any reference to debt collection calls made to residential telephone lines. *Id.* at 1340. At bottom:

> Considering Congress knew of cellular telephones—and in fact referenced cellular telephones as distinct from residential telephones throughout the TCPA—a proper interpretation of the statute would conclude that Congress ***intentionally omitted*** any reference to cellular telephones in section 227(c).

*Id.* (citing *Pinares v. United Techs. Corp.*, 973 F.3d 1254, 1262 (11th Cir. 2020) ("Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."), and *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1217 (11th Cir. 2015) ("Where Congress knows how to say something but chooses not to, its silence is controlling.")). That means that the protections in 47 C.F.R. § 64.1200(c)(2) "would not apply to cellular telephone numbers, and [Plaintiffs'] claim would be foreclosed." *Id.* at 1341.

Judge Moreno's decision in *Cunningham v. Lines*, 2016 WL 7494871, at *1-2 (S.D. Fla. Dec. 29, 2016) is also instructive. That case was brought by a plaintiff who contended that calls to his cellular phone violated § 227(b)(1)(B). In relevant part, § 227(b)(1)(B) provides that:

> It shall be unlawful for any person within the United States ... to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party[.]

Like § 227(c), this section only uses the term "residential." Judge Moreno observed that "[w]hile Plaintiff argues that his cellular phone serves as both a mobile and residential line, the Eleventh Circuit distinguishes residential land line telephone numbers from cell-phone numbers." *Id.*, at *2 (citing *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1250 (11th Cir. 2014)).

Judge Williams analysis in *Cabrera v. Gov't Emps. Ins. Co.*, 452 F. Supp. 3d 1305, 1313-14 (S.D. Fla. 2014) is also helpful. In that case, the plaintiff (who only had a cellular phone) contended that he could be a proper class representative for individuals who received calls to their residential phones in violation of § 227(b)(1)(B) (which, as noted above, only mentions residential phones). *Id.* at 1312. While the plaintiff contended that the reference in § 227(b)(1)(B) to residential phones and not cellular phones is a "distinction without a difference," Judge Williams found that such "argument [wa]s without merit," noting that "'[p]ractical realities' as well as the plain language of the TCPA 'support a distinction between residential and cellular lines.'" *Id.* at

-7-

1314 (quoting *Breslow v. Wells Fargo Bank, N.A.*, 857 F. Supp. 2d 1316, 1320 (S.D. Fla. 2012) (Scola, J.)).

While Plaintiffs may argue that *Cunningham*, *Cabrera, Osorio,* and *Breslow* are not relevant to the analysis of § 227(c), such an argument would miss the point. The trans-substantive point is that the relevant parts of the statute—§§ 227(b)(1)(A), (b)(1)(B), and (c)(5)—were all in the original statute, as enacted in December 1991, and there is every indication from the face of the statute that Congress viewed residential phones and cellular phones as different things.

Moving across the country and returning directly to the language in § 227(c)(5), MD Exam notes that this Court's analysis in *Turizo* was echoed by the persuasive analysis presented by Judge Sandra Ikuta about five months later in her dissent in *Chennette v. Porch.com*, 50 F.4th 1217, 1231-40 (9th Cir. 2022), a case which addressed whether a cell phone used for both business and personal purposes can constitute a "residential" phone under the TCPA. *Id*. at 1223-26. Because of the Hobbs Act, the majority opinion concluded that a cell phone used for both purposes can be "residential," based significantly on the 2003 DNC Order, which stated that a cell phone registered on the DNC registry is presumptively "residential." *Id.* at 1223-25.

Judge Ikuta deconstructed the issue by interpreting "residential telephone subscribers" under § 227(c), noting that when the TCPA was enacted "the most applicable dictionary definition for 'residence' was 'a house where one's home is; a dwelling house.'" *Id.* (citing Black's Law Dictionary (6th ed. 1990)). Judge Ikuta added that "[t]he dictionary defines the word 'residential' to mean 'of, relating to, or connected with residence or residences.'" *Id.* (quoting Webster's Third New International Dictionary (1981)). Thus, a "cellphone, which is mobile and not connected to a house, fixed abode, or dwelling, is not 'residential' under the definitions provided by dictionaries current when the TCPA was enacted." *Id.*

Judge Ikuta also surveyed various publicly available resources establishing that it was

commonly "understood that a 'residential telephone' referred to a land line at a residence." *Id.* Indeed, "installation guides at the time assumed residential telephones were wired telephones." *Id.* at 1233 n.1 (citing Robert W. Wood, *Home Electrical Wiring Made Easy: Common Projects and Repairs*, 143 (1988); James L. Kittle, *Mastering Household Electrical Wiring*, 278 (1988); and UBM LLC, Local Area Network Magazine: LAN 1990-06: Vol. 5 Issue 6, 147 (1990)).[5]

With the issuance of *McLaughlin*, the Court may assume its traditional role. The Supreme Court held that "[d]istrict courts are not bound by the agency's interpretation, but instead must determine the meaning of the law under ordinary principles of statutory interpretation, affording appropriate respect to the agency's interpretation," and reasoned that there is a "basic presumption of judicial review" of agency action, which applies unless clearly displaced by Congress. 145 S. Ct. at 2015 (citing *Loper Bright Enterprises v. Raimondo*, 603 U. S. 369, 402 (2024)). And the Supreme Court held there was no clear displacement of judicial review of FCC orders and interpretations in private enforcement proceedings. *Id.* at 2018-19.

With the Hobbs Act no longer a roadblock, the Court should apply its reasoning from *Turizo* and enter judgment in MD Exam's favor. This case is about text messages to cellphone numbers that are on the DNC Registry. However, Congress "intentionally withheld" any "authority to create a registry that included cellular telephone numbers." *Turizo*, 603 F. Supp. 3d at 1340. When the FCC "presume[d] wireless subscribers" on the DNC Registry qualify as "residential subscribers," it improperly "expand[ed] section 227(c)(5)'s right of action to cellular telephone

---

[5] Judge Ikuta also noted that the understanding that "residential phones were land lines and distinct from wireless phones persisted for years after the enactment of the TCPA." *Id.* (citing Crain Communications, Inc., Electronic Media 1996-04-29: Vol. 15 Issue 18, 28 (1996) (distinguishing the "wired residential telephone business" and the "wireless telephone business"); R&D Magazine 1996-11: Vol. 38 Issue 12 (1996) (referring to "residential telephone wiring"); and James T. Geier, *Network reengineering: the new technical imperative*, 158 (1996) (referring to "current residential telephone wiring")).

subscribers—without any congressional grant of authority to do so." *Id.* at 1341. That means that the protections in 47 C.F.R. § 64.1200(c)(2) do not apply to the text messages at issue.

### B.     The Cases Diverging from *Turizo's* Analysis Are Unpersuasive

MD Exam is mindful that there are district courts that have reached contrary conclusions, holding that, even if the Hobbs Act was not in the mix, § 227(c) should be interpreted to include cellular phones. These cases are unpersuasive.

*Mantha v. QuoteWizard.com, LLC*, 2022 WL 325722 (D. Mass. Feb. 3, 2022), issued a few months before *Turizo*, provides a good example. While *Mantha* concedes that a "residential telephone line" as used in § 227(b)(1)(B) means a land line and not a cellular phone, the decision then shifts and interprets the term "residential telephone subscriber" in § 227(c)(1) as "a functional term not tethered to a particular technology" (like a land line or cell tower). *Id.* at *4; *see also Cacho v. McCarthy & Kelly LLP*, 739 F. Supp. 3d 195, 205-08 (S.D.N.Y. 2024) (similar).

From there, *Mantha* and courts applying similar reasoning conclude that the different contexts in which the term "residential" is used in these provisions permits different *meanings* across them. *See Mantha*, 2022 WL 325722, at *4-5; *Cacho*, 739 F. Supp. 3d at 204-06.  According to this view, § 227(b) references a residential "technology," more commonly known as a land line; and § 227(c) means a residential "function," meaning the use of any phone, untethered to a place, for personal use, not business or governmental use. *Mantha*, 2022 WL 325722, at *4 ("'residential [ ]' is a functional term not tethered to a particular technology"); *Cacho*, 739 F. Supp. 3d at 206.

These cases also deemed as persuasive the fact that the FCC concluded, in crafting the 2003 DNC Order, that "wireless or cellular telephones may qualify under the term 'residential telephone subscriber.'" *Mantha*, 2022 WL 325722, at *4 (citing 2003 DNC Order at 14039); *Cacho*, 739 F. Supp. 3d at 202-03. And they point to FCC implementing regs that "interpret the term 'residential telephone' to encompass, in certain circumstances, wireless phone numbers." *See*

*Mantha*, 2022 WL 325722, at *4 (citing, *inter alia*, 47 C.F.R. §§ 64.1200(c)(2), (e)).

Such a reading of the statute and regulations is mistaken for several reasons.

### i.      Plain Meaning

*First*, as discussed above and in *Turizo*, the analysis featured in cases like *Mantha* and *Cacho* conflicts with the plain meaning canon. As Judge Ikuta stressed, as of 1991, "the most applicable dictionary definition for 'residence' was '[a] house where one's home is; a dwelling house,'" and "the word 'residential' [] mean[s] 'of, relating to, or connected with residence or residences.'" *Chennette*, 50 F.4th at 1233 (Ikuta, J., dissenting) (quoting Black's Law Dictionary, Sixth Edition (1990) and Webster's Third New International Dictionary (1981) respectively).

By untethering "residential" from "residence," courts following this alternative analysis are not faithful to the TCPA's original meaning. *See Loper Bright*, 603 U.S. at 400 ("every statute's meaning is fixed at the time of enactment") (quoting *Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 284 (2018)).

### ii.      Interpretive Clues from Within the Statute

*Second*, other standard interpretive tools confirm MD Exam's position. "Residential telephone" appears throughout the TCPA and its regulations. *See* 47 U.S.C. §§ 227(b)(1)(B), (c)(1), (c)(3); 47 C.F.R. §§ 64.1200(a)(7)(ii), (b), (c), (d), (g). Courts should presume that "identical words and phrases within the same statute should normally be given the same meaning." *Powerex Corp. v. Reliant Energy Servs., Inc.*, 551 U.S. 224, 232 (2007).

Cases like *Cacho* and *Mantha* go astray by redefining the term "residential" across provisions. As they see it, a "residential telephone *line*" means a landline, *see Cacho*, 739 F. Supp.3d at 205-06, but a "residential telephone *subscriber*" means any non-government or business entity who uses any kind of phone. *See id.* (defining "residential" as something like "for personal activities" or "personal" or "relating to a resident").

-11-

*Mantha, Cacho,* and like cases, also fail to provide any analysis (or even mention) other important interpretive clues in the TCPA's text itself. In the next section, we cover the lead-up to the DNC Registry's implementation by the FTC and FCC in 2003. But for the limited question of whether Congress covered cellular phones when it enacted the TCPA in 1991, it is helpful to look at §§ 227(c)(1)(A) and 227(c)(3)(C).

To begin, in 1991, Congress instructed the FCC, in **§ 227(c)(1)(A)** to

compare and evaluate alternative methods and procedures (including the use of electronic databases, telephone network technologies, special directory markings, industry-based or company-specific 'do not call' systems, and any other alternatives, individually or in combination) for their effectiveness in protecting [residential telephone subscribers'] privacy rights[.]

Then, **§ 227(c)(3)** provides twelve instructions to the FCC from Congress, (A-L), that told the FCC what it would have to do if it opted to set up what amounted to a national do-not-call list. Here, § 227(c)(3)(C) is critical: it is a clear data point demonstrating that when Congress enacted the TCPA in December 1991, it did not intend to include calls to cellular phones in § 227(c).

Specifically, the section provided that if the FCC determined that a national do-not-call list was required, **§ 227(c)(3)(C)** provides that the implementing regulation shall

specify the methods by which each telephone subscriber shall be informed, by the common carrier that provides **local exchange service to that subscriber,** of (i) the subscriber's right to give or revoke a notification of an objection under subparagraph (A), and (ii) the methods by which such right may be exercised by the subscriber;

While this paragraph may not appear to be doing much work, it actually gives up the whole game. The term "**local exchange service**" is the critical one. And we have clear evidence indicating what that term meant in the early 1990s—the required time period to examine under *Bostock.* Specifically, Justice Scalia observed for the Supreme Court that:

Until the 1990's, local phone service was thought to be a natural monopoly. States typically granted an exclusive franchise in each local service area to a local exchange carrier (LEC), which owned, among other things, the local loops (wires

> connecting telephones to switches), the switches (equipment directing calls to their destinations), and the transport trunks (wires carrying calls between switches) that constitute a local exchange network.

*AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 371 (1999). Justice Breyer's concurring opinion in *AT&T Corp* is also illuminating, as he noted that the "congressional uncertainty" regarding how the telephone service market would develop and, as an example of this uncertainty expressed in the 1996 Telecommunications Act (five years *after* the TCPA was enacted), posited the following question: "Will wireless technology or cable television lines, for example, permit the efficient provision of local telephone service without the use of existing telephone lines that now run house to house?" *Id.* at 428.

And of recent vintage, Justice Gorsuch's dissent in *FCC v. Consumers' Research*, 2025 WL 1773630, at *26 (U.S. June 27, 2025) provides a helpful history of the telephone industry going back to the early 20th century and into the present. As Justice Gorsuch noted, "today … three quarters of American adults live in households without a landline telephone." *Id.* at *26 n.1 (citing S. Blumberg & J. Luke, National Center for Health Statistics, Wireless Substitution 2 (June 2024)). Justice Gorsuch added that "in 1996, things looked different. Local phone service depended on a network of copper wires connecting each home and business." *Id.*; *see also* P. Huber, *et al.*, *Federal Telecommunications Law* § 1.2.2 (3d ed. Supp. 2022).

In the period leading up to the adoption of the TCPA, it was understood that "local exchange service" and "cellular service" were different things. For instance, in the late 1980s, there was considerable activity concerning the allocation of cellular spectrum, and the D.C. Circuit took note of a policy to "divide cellular spectrum in each geographic market between two cellular licensees, one a 'wireline' applicant, *i.e.*, a telephone company providing local exchange service (such as one of the Bell operating companies) and the other a non-wireline applicant." *Maxcell*

*Telecom Plus, Inc. v. FCC.*, 815 F.2d 1551, 1556 (D.C. Cir. 1987).

Indeed, in the 1990s, industry experts understood that "local exchange service has traditionally been provided by landline facilities (i.e. twisted copper wires which carry transmission signals from a central office switch to a subscriber's home or office)." Lisa M. Warner, Wireless Technologies Creating Competition in the Local Exchange Market: How Will Local Exchange Carriers Compete?, 4 COMMLAW CONSPECTUS 51, 54 (1996) (citing P. Huber, *et al.*, *Federal Telecommunications Law*, at 5-6 (3d ed. 1992).

Likewise, in a case following the break-up of AT&T, it was observed that "[l]ocal exchange telephone service is the ordinary service used in nearly all homes and businesses. From a technical standpoint, it involves a wire connection from the telephone set to a switching system in a nearby telephone company switching center that is in turn connected by transmission trunks to switching systems in other switching centers within the exchange area." *S. Pac. Commc'nsCo. v. Am. Tel. & Tel. Co.*, 556 F. Supp. 825, 855 n.9 (D.D.C. 1982).

Section 227(c) embodies this early 90's state of affairs. When Congress enacted the TCPA in 1991, it directed the FCC to consider alternatives to a national registry, including "(i) whether the needs of telemarketers operating on a local basis could be met through special markings of **area white pages directories**, and (ii) if such directories are needed as an adjunct to database lists prepared by area code and local exchange prefix." 47 U.S.C. § 227(c)(4)(C).

These references are telling because the "white pages" were limited to residential telephone numbers (land lines) and local exchange carriers (not cellular providers) were required to publish local white pages. Florida's white pages regulations provide a useful case study on this point. Florida has long had some version of white pages requirement for the local phone company. Following the required notice, the Florida Public Service Commission (the "Florida PSC")

-14-

published an amended rule on March 13, 1991, which became effective on March 31, 1991. *See Re Tel. Directories; Directory Assistance*, 1991 WL 496907 (Fla. P.S.C. Mar. 13, 1991). In relevant part, the rule, as adopted provided that

> (1) Each **local exchange telecommunications telephone company** shall normally **publish** updated **telephone directories** once every 12 months and shall publish updated directories at least once every 15 months. The directories shall normally alphabetically list the name, address, and telephone number of all subscribers located in the exchange(s) contained in the directory … At no additional charge and upon the request of any **residential subscriber**, the exchange company shall list an additional first name or initial under the same address, telephone number and surname[6] of the subscriber.
>
> \* \* \*
>
> (7) When a **subscriber** will establish a **residence** … shortly after the close of subscriber listing records but preceding publication, the *local* exchange *telecommunications* company shall, upon request, establish and list service at the requested new address[.]

*Id*. This March 1991 order from the Florida PSC provides a useful time capsule to understand how regulators, telephone companies, and even the public, thought about telephone service in that era. These takeaways include: (a) the white pages had to be published by the local telephone company; (b) it had to list the telephone number for each residential subscribers; and (c) the service that a local telephone company provided to residential subscribers was provided to residences.[7]

If, as Congress contemplated, privacy rights of "residential telephone subscribers" could

---

[6] This point may seem trivial, but it further underscores that 1991 was a very different time in American life. On its face it appears that, under this regulation, a wife who did not take her husband's last name was not permitted to have her name listed in the phone book.

[7] Florida's white pages requirement was similar to those that were in place as of 1991 across the country. *See, e.g.,* 16 NYCRR 602.10(b) (requiring "**local exchange service**" provider to "distribute at no charge to its customers within a local exchange area, a copy of the local exchange directory for that area"); 16 Tex. Admin. Code §§ 26.272(c)(1), (e)(1)(D)(v) (requiring that "certificated telecommunications utility (CTU) that provides **local exchange service** … distribute[] [White pages] to each customer located within the geographic area covered by the white pages telephone directory."); *In Re Rulemaking on Comm'ns Own Mot. into Universal Serv., to Comply with Mandates of Assembly Bill 3643*, 68 CPUC 2d 524, Appendix B §§ 4(A), (B)(11) (Cal. P.U.C. Oct. 25, 1996) (same essential requirement).

potentially be preserved through markings in the **white pages**, that means "residential telephone subscribers" must be users of land line phones associated with a residence (*i.e.*, those numbers that were generally listed in white pages in 1991). And the references to white pages in the statute also underscores the difference between landlines and cellular phones in that era.[8]

### iii.   Regulatory History

*Third*, regulatory history further supports MD Exam's position. Notably, in 1992, when the FCC first considered whether to implement a DNC Registry, they considered the issue under the subheading "Alternatives to Restrict Telephone Solicitation to **Residences**." *In Re Rules & Reguls. Implementing the Tel. Consumer Prot. Act of 1991*, 7 F.C.C. Rcd. 8752, 8758 (1992).

Indeed, during the rulemaking process leading up to the 2003 DNC Order, the FCC asked commenters whether "wireless telephone numbers … be considered 'residential telephone numbers' for the purposes of the Commission's rules on telephone solicitations?" *In Re Rules & Reguls. Implementing Tel. Consumer Prot. Act of 1991*, 17 F.C.C. Rcd. 17459, 17485 (2002). This demonstrates that the agency did consider the statutory reference to "residential telephone subscriber" to cover cellular phones but rather were looking for a way to shoehorn cellular phones

---

[8] While cell phone numbers were not listed in white pages when the TCPA was enacted in 1991, in the following decade there were well publicized efforts to create a national cellphone directory (*i.e.*, a cellphone white pages). A decade after the TCPA was enacted there were more than 100 million cellular telephone subscribers, but "there [we]re no phonebooks for wireless listings, and wireless numbers are excluded from directory assistance databases." https://tinyurl.com/4w2euehb. In 2004, Cellular Telecommunications and Internet Association (CTIA)—the industry trade group for the cellular phone industry—proposed to create the first national cell phone directory. https://tinyurl.com/544t7k9x. The industry sentiment was not universal and the CEO of the largest cellular phone company, Verizon, expressed the view that directory was "something … customers … clearly don't want. It's a dumb idea." https://tinyurl.com/3ubt6zky. Likewise, in her written testimony to a Senate hearing that Senator John McCain convened, the representative for Consumers Union (a leading consumer advocacy group) was highly critical of the idea of a national wireless directory. https://tinyurl.com/m7h3b4y6. Following widespread outcry (and Verizon's continued opposition) the various efforts to establish a wireless white pages were abandoned. https://tinyurl.com/3kwn2ur9.

into the overall enterprise of limiting telephone solicitations because it apparently perceived that was the policy goal of the statute. However, as the Eleventh Circuit told the FCC earlier this year, "[a]textual good policy cannot overcome clear text." *Ins. Mktg. Coal.*, 127 F.4th at 315.

### iv.   *Loper Bright*

*Fourth*, when the FCC declared in 2003 that it interpreted "residential telephone subscribers" to include cellular subscribers, it did *not* rely on dictionary definitions and other then contemporary understandings of the term as they existed in 1991. *See* 2003 DNC Order at 14038-39. Instead, the FCC focused on policy rationales that arose a dozen years after the statute was enacted. *Id*. To the extent that *Chevron* deference may have saved the FCC's redefinition of "residential" to suit the cellular age, those days are over. This Court now plays its traditional role, as the final arbiter of the meaning of federal law. *See Loper Bright*, 603 U.S. at 412 ("*Chevron* is overruled. Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority, as the APA requires.").[9]

### v.   **Legislative History**

*Fifth*, legislative history, if relevant,[10] confirms the plain meaning interpretation.

_____

[9] Even in present times, the FCC recognizes the distinction between wireless telephone subscribers and residential telephone subscribers. In its 2024 Marketplace Report, the FCC reported that, as of the end of 2023, there were "approximately 24.1 million residential subscriptions" and "approximately 386.1 million mobile subscriptions" in the voice category. 2024 FCC Report, 2024 WL 5330303, at *63-64 ¶¶ 156, 158. The FCC also referenced data from the Department of Labor ("DOL") that recognizes a similar distinction, specifically noting that the DOL's Bureau of Labor Statistics ("BLS") recognizes in its Consumer Price Index ("CPI") that "'Telephone Services' has two components: Wireless telephone services and Residential telephone services (previously known as 'Landline telephone services).'" 2024 FCC Report, 2024 WL 5330303, at *41 n.261. In fact, the BLS has collected separate data on mobile phones (which it originally categorized as "car phones") since 1991. *See* https://www.bls.gov/cex/anthology08/csxanth9.pdf.

[10] While MD Exam is not staking its entire argument here on the legislative history, in three published opinions the Eleventh Circuit has favorably relied, *in part*, on the TCPA's legislative history. *See Palm Beach Golf Ctr.-Boca, Inc. v. John G. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1252 (11th Cir. 2015) (citing H.R. Rep. No. 102-317, at 10 (1991) to conclude that the intend of rule

-17-

Congressional reports refer specifically to "residential telephone customers" and *separately* discusses cellular phones. H.R. Rep. No. 102-317, at 6, 11, 24, 102d Cong. (1991); S. Rep. No. 102-178, at 1, 102d Cong. (1991) ("The purposes of the bill are to protect the privacy interests of residential telephone subscribers by placing restrictions on unsolicited, automated telephone calls to the home[.]"); *Chennette*, 50 F.4th at 1233-34 (Ikuta, J., dissenting) (legislative history confirms "[t]he common understanding that the terms 'residential' and 'residential telephone' refer to a land line in the home") (citing, *inter alia*, 137 Cong. Rec. 30824 (1991), S. Rep. No. 102-178, at 7 (1991)).

### vi.   Grammatical Clues

*Sixth*, and finally, basic rules of grammar establish that Congress did not intend to include cellular phone subscribers within Section 227(c)(1)'s coverage. It is a general rule of statutory construction that, "[w]hen interpreting a phrase, one should not 'divorce a noun from the modifier next to it without some extraordinary reason.'" *NextSun Energy Littleton, LLC v. Acadia Ins. Co.*, 494 F. Supp. 3d 1, 15 (D. Mass. 2020) (quoting *Lopez v. Gonzales*, 549 U.S. 47, 56 (2006)). Applying this approach and recognizing that "residential" immediately precedes "telephone" in both § 227(b)(1)(B) ("residential telephone line") and in § 227(c)(1) ("residential telephone subscriber") shows a residential telephone, or phone associated with a *particular residence*, is the subject of both provisions as a matter of basic grammar.

*     *     *

At bottom, it is for Congress, not agencies, to adapt Congress's work to accommodate

---

relating to faxes was "clear from the legislative history of the statute"); *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242, 1255–56 (11th Cir. 2014) (citing floor statements of Senate sponsor of TCPA reported at 137 Cong. Rec. 30,821-22 (1991) to inform understanding of Congressional intent with respect to consent under the TCPA); *Schweitzer v. Comenity Bank*, 866 F.3d 1273, 1276 (11th Cir. 2017) (favorably citing *Osorio's* reference to the legislative history of the TCPA).

changing times. *Bostock*, 590 U.S. at 654-55 (judges may not "add to, remodel, update, or detract from old statutory terms"); *Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ("The question here is not whether something should be done; it is who has the authority to do it."); *Texas v. United States*, 497 F.3d 491, 504 (5th Cir. 2007) ("that later-arising circumstances cause a statute not to function as Congress intended does not expand the congressionally-mandated, narrow scope of the agency's power").

## II.     The Court Should Enter Judgment in MD Exam's Favor Because There Is No Private Right of Action to Enforce the Regulation Plaintiffs Invoke

MD Exam also submits that there is no private right of action to enforce the regulation that Plaintiffs claim MD Exam has violated. Here, MD Exam is mindful it may be taking a big swing, and the Court's "task … is not to go abroad in search of dragons to slay." *United States v. Robinson*, 119 F.3d 1205, 1217 (5th Cir. 1997). But this is an important issue that will confront federal courts in the post-*McLaughlin* environment and, even if the Court disagrees with MD Exam (or stops its analysis after finding in MD Exam's favor on its first ground), it provides helpful context for the examination of the *other* issues.

The Supreme Court has held that "private rights of action to enforce federal law must be created by Congress." *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001). The intent to create a private right of action "will not be presumed." *Baggett v. First Nat'l Bank of Gainesville*, 117 F.3d 1342, 1345 (11th Cir. 1997).  The inquiry instead "begins and ends with a careful examination of the statute's language." *In re Wild*, 994 F.3d 1244, 1255 (11th Cir. 2021).

Before we jump in too far, MD Exam acknowledges that in *Cordoba v. DIRECTV, LLC*, 942 F.3d 1259, 1265 (11th Cir. 2019), the Eleventh Circuit stated that the "TCPA creates a private right of action for anyone who receives more than one call within a year from the same entity in violation of these regulations… ." Upon careful examination, MD Exam submits that this

-19-

statement is *dicta* and should not control the Court's analysis

As an initial matter, *Cordoba* addressed a claim under § 227(d), concerning "[w]hether a recipient of a telemarketing call who did not request to be placed on the caller's internal DNC [do-not-call]" could bring a claim against a caller that failed to institute appropriate internal DNC list procedures. *Id.* at 1267. The FCC's rules regarding internal DNC were enacted *before* the September 20, 1992 deadline, pursuant to its time-limited rulemaking authority. Thus, *Cordoba* did not address whether there is a private right of action to enforce rules enacted *after* that deadline.

From the appellate briefs, filings, and oral argument in *Cordoba*, it is evident that neither the defendant or its amici challenged the issue.[11] This statement thus appears the type of "prefatory, stage-setting paragraph which merely served to tee up the case-or-controversy analysis that followed," which, as Judge Cannon observed last year, should be considered *dicta*. *United States v. Trump*, 740 F. Supp. 3d 1245, 1290-91 (S.D. Fla. 2024) (ruling that Supreme Court's statement in *United States v. Nixon*, 418 U.S. 683 (1974) regarding the authority of the Watergate Special Prosecutor was *dicta*, because, *inter alia*, President Nixon did not challenge the authority).[12]

Otherwise, if *Cordoba* is read to suggest there is a generalized private right of action to enforce rules issued under Section 227(c), it should be considered *dicta. See United States v. Gillis*, 938 F.3d 1181, 1198 (11th Cir. 2019) ("[D]icta is a statement that neither constitutes the holding of a case, nor arises from a part of the opinion that is necessary to the holding of the case."). This

---

[11] *See Cordoba v. DIRECTV, LLC*, No. 18-12077, ECF Nos. 25 (appellant's brief), 34 (appellee's brief), 38 (amicus brief), 42 (appellant's corrected reply brief) (11th Cir. 2019) and https://tinyurl.com/yc65tprk (oral argument).

[12] Similar to MD Exam's confirmation that the private right of action issue was not raised in *Cordoba*, to confirm that the relevant point had not been raised in *Nixon*, Judge Cannon noted that "the Court collected and reviewed all available filings" in [the cases] … includ[ing] the applicable cert petitions and merits briefing, along with amicus briefs, the full appendix, and the consolidated oral argument transcript." *United States v. Trump*, 740 F. Supp. 3d at 1285 n. 46.

Court should not rely on *dicta. See e.g., Fresh Results LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1049 (11th Cir. 2019) ("[a]lthough our holdings are precedential, our dicta are not").

For the reasons that follow, the Court should enter judgment in MD Exam's favor.

### A.    TCPA Section 227(c) Provided 120 Days to Enact Rules Subject to a Private Right of Action

The inquiry begins with the statute's text. On December 6, 1991, following passage by the House ten days before, the Senate passed SB 1462—the Telephone Consumer Protection Act of 1991[13]—which was, in essence, an amendment to the groundbreaking Communication Act of 1934. President George H.W. Bush signed the act into law on December 20, 1991.

To best understand what 47 U.S.C. § 227(c) was about, it is useful to actually start with examining the *other* main part of the 1991 enactment: § 227(b), which established a broad range of restrictions on use of automated telephone equipment. This is where the restrictions on the use of automatic telephone dialing systems (ATDS), prerecorded voices, and artificial voices come from, as well as the restrictions relating to unsolicited faxes, are found. Some prohibited conduct was specifically delineated by Congress (such as "robocalls" to specified recipients, *see* 47 U.S.C. § 227(b)(1)), and Congress also provided that the FCC "shall prescribe regulations to implement the requirements of this subsection." *Id.* § 227(b)(2). Notably, the delegation to the FCC to prescribe these regulations under § 227(b) was not time limited.

However, unlike § 227(b) which, on the day § 227(b) was signed into law it prohibited American citizens from taking a number of actions and gave the FCC *non-time limited* delegation to issue regulations to *further* implement the policies that Congress approved, § 227(c) did not facially prohibit anything. Instead, in December 1991 Congress gave the FCC a homework assignment: take the next nine months and figure out a system so that American citizens would

---

[13] https://www.congress.gov/bill/102nd-congress/senate-bill/1462/all-actions.

have a way to not receive unwanted marketing phone calls to their residential telephones.

Congress directed the FCC to initiate a rulemaking within 120 days of December 20, 1991 to address "residential telephone subscribers' [] rights to avoid receiving telephone solicitations to which they object." 47 U.S.C. § 227(c)(1). Congress also directed the FCC to consider establishing national "do not call" systems, and to "develop proposed regulations" it determined were "most effective and efficient to accomplish the purposes of this section." *Id.* §§ 227(c)(1)(A), (E). Congress imposed an express deadline: the FCC had to "conclude" its rulemaking under § 227(c)(1) "[n]ot later than 9 months after December 20, 1991. *Id.* § 227(c)(2). In ordering the FCC to work under a nine-month deadline, Congress distinguished between that grant of authority and the grant it bestowed the FCC under § 227(b), the immediately preceding provision.

That distinction is important. Congress included provisions entitled "private right of action" under both § 227(b) and 227(c), but only limited the latter:

- In **Section 227(b)(3)**, Congress authorized private suits based on a violation of Section 227(b), "or the regulations prescribed under" Section 227(b)'s grant of authority. As just noted, such regulations had no time limit.

- In **Section 227(c)(5)**, Congress authorized private suits ***only*** for a "violation of the regulations prescribed under this subsection," Section 227(c), which the FCC had to issue within nine months of December 20, 1991, or by September 20, 1992.

The upshot of this scheme is that Congress authorized private parties to sue for violations of § 227(b), or rules issued under § 227(b)'s authority, without a time limit for enacting such rules. In contrast, Congress vested the right in private parties to enforce rules issued under § 227(c)'s authority, if those rules were issued on or before November 20, 1992. Plaintiffs here are not suing for violation of an FCC order issued within the Congressionally-mandated nine-month window, so they do not have a private right of action here.

### B.    The FCC Promulgated Two Rules Within Section 227(c)'s Statutory Deadline, but Neither Is at Issue Here

In response to the instructions from Congress, the FCC initiated a rulemaking in 1992 and elected not to create a do-not-call database by the September 20, 1992 deadline. *See* 1992 TCPA Order, 7 F.C.C. Rcd. 8752, 8760 ¶ 14 ("A national database would be [too] costly and difficult to establish and maintain in a reasonably accurate form."). The only rules issued under FCC's § 227(c) authority directed telemarketers to comply with (i) time-of-day restrictions, *see* 47 C.F.R. § 64.1200(c)(1) and 1992 TCPA Order, 7 F.C.C. Rcd. at 8791, and (ii) the "internal do-not-call list" rule (the rule at issue in *Cordoba*), under which companies must timely honor consumer requests not to receive further sales calls. *See* 47 C.F.R. § 64.1200(d); 1992 TCPA Order, 7 F.C.C. Rcd. at 8791. These were the ***only*** regulations issued by the FCC (i) under its § 227(c) authority; ***and*** (ii) within nine months of December 20, 1991. They are, consequently, the only two rules issued under § 227(c)'s authority that may be enforced privately under § 227(c)(5).

### C.    The Rule Plaintiffs Are Suing Under Was Enacted Eleven Years After § 227(c)'s Statutory Deadline And Thus Cannot Be Enforced Privately

Plaintiffs are suing under 47 C.F.R. § 64.1200(c)(2), for "delivering, or causing to be delivered, more than one advertisement or marketing text message to residential telephone numbers registered on the … DNC Registry." Compl. at 1, ¶ 8 (invoking § 64.1200(c)(2)), ¶¶ 61-64.

The FCC promulgated § 64.1200(c)(2) in 2003: ***eleven years*** after the statutory deadline. In 2003 the Federal Trade Commission (FTC) created the DNC Registry and the 2003 rules were enacted to allow the FCC to police violations of the DNC Registry by entities subject to the FCC's jurisdiction. Indeed, the FCC has pursued numerous enforcement actions alleging apparent violations of its DNC Registry regulation. *See* https://transition.fcc.gov/eb/tcd/eabydate.html.

The 2003 rules, including § 64.1200(c)(2), were *not* enacted pursuant to the FCC's time-limited authority under § 227(c). For the 2003 regulations to be subject to a private right for which

the Congressional delegation expired in 1992 would require use of a time machine, and thus cannot be a plausible, let alone the best, interpretation. *See Akiki v. Bank of Am., N.A.*, 632 F. App'x 965, 969 (11th Cir. 2015) (contention at issue was "not possible in a temporal sense because, absent some time travel mechanism, a person's reluctant agreement to a demand in 2012 can never be said to have been given for the purpose of receiving a benefit that had already been conferred four years before."); *Loper Bright*, 603 U.S. at 408-09 (every statute "has a best meaning").

To be clear, MD Exam is not asking that the Court declare that the FCC's 2003 Order was completely *ultra vires* and thus void. While simply looking at a calendar and counting nine months from December 1991 establishes that the Congressional delegation to enact the rules in the 2003 Order could not have come from the 1991 enactment of the TCPA, it is clear the FCC's authority to issue § 64.1200(c)(2) in 2003 came from a *different* Congressional enactment, which a *different* President George Bush signed into law: The Do-Not-Call Implementation Act ("2003 DNC Act"), Pub. L. No. 108-10, § 3, 117 Stat. 557 (2003).

The source of authority is critical. In § 3 of the 2003 DNC Act, Congress directed the FCC, by September 7, 2003, to "issue a final rule" relating to the FTC's [DNC Registry] after coordinating with the FTC "to maximize consistency with the rule promulgated by the [FTC] …."). *Id.* In the 2003 DNC Act, Congress neither mentioned § 227(c) generally, nor its expired grant of rulemaking authority in §§ 227(c)(1)-(2) specifically. Accordingly, there is no Congressionally-authorized private right of action under § 227(c)(5) for violations of those 2003 rules.

In fact, the FCC acknowledged that the 2003 rulemaking did not itself give private parties a right to sue, and it declined to state that private parties have any right to enforce § 227(c)'s provisions. *See* 2003 DNC Order ¶ 206 ("The [FCC] declines to make any determination about the specific contours of the TCPA's private right of action. … The [FCC] believes it is for Congress, not the [FCC], to either clarify or limit this right of action."). Ultimately, the FCC's comment in ¶

206 was correct (though unnecessary); any FCC rules issued under the FCC's § 227(c) authority could be enforced privately only if published on or before November 20, 1992; § 64.1200(c), the rule Plaintiffs invoke was published in 2003; and only Congress can authorize the FCC to enact new rules subject to a private right of action, which it has not done here.[14]

*     *     *

If it reaches the question, the Court should thus find that there is no private right of action for private citizens like Plaintiffs to sue for alleged violations of the National DNC Registry.

CONCLUSION

For the reason set forth herein, the Court should enter an order finding that Defendant MD Exam is entitled to judgment on the pleadings and should enter judgment in favor of MD Exam and against Plaintiffs Gillian Cramer and Jamie Crowder that provides Plaintiffs shall take nothing and that MD Exam shall be permitted to go hence without day.

Dated: July 17, 2025

By: *Aaron S. Weiss*

Aaron S. Weiss (FBN 48813)
aweiss@carltonfields.com
Carlton Fields, P.A.
700 N.W. 1st Avenue, Ste. 1200
Miami, Florida 33136
Telephone: 305-530-0050

*Attorneys for Defendant MD Exam, LLC*

---

[14] Plaintiffs may also contend that MD Exam's argument would render the FCC's 2003 Order meaningless in relevant part. This would not be accurate. In fact, 47 U.S.C. Ch. 5 contemplates multiple avenues for TCPA administration and enforcement by the FCC. The FCC can apply for issuance of a writ or injunction to command a person's compliance with the provisions of Chapter 5, which includes the TCPA. 47 U.S.C. §§ 401(a), (b). The FCC can also apply for enforcement of the TCPA by a United States Attorney, *Id.* § 401(c), who can proceed with criminal or civil enforcement. *Id.* §§ 501-02. Also, following a notice of apparent liability, "[b]y statute, the FCC may impose a forfeiture penalty on a party who 'willfully or repeatedly failed to comply with any of the provisions of [Chapter 5, Title 47, United States Code] or of any rule, regulation, or order issued by the Commission.'" *United States v. Sling Broadband, LLC*, 2012 WL 5989653, at *2 (S.D. Fla. Nov. 30, 2012) (Rosenbaum, J.) (quoting 47 U.S.C. § 503(b)(1)).

-25-